Filed 8/16/16  Quinlan v. Paxton CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| BRENDAN QUINLAN,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JOHN PAXTON,<br><br>        Defendant and Appellant. | A145008<br><br>(San Francisco County<br>Super. Ct. No. CGC-13-535986) |

This dispute, over the scope of landlord Brendan Quinlan's duty to repair and the scope of tenant John Paxton's right to control the "color, style, and quality" of those repairs pursuant to a 1986 residential lease, originated over a decade ago and ultimately resulted in three years of litigation.  After Quinlan was granted a preliminary injunction permitting him entry to make repairs to Paxton's apartment, a bench trial was conducted to interpret the contested lease terms.  The trial court determined that Quinlan's claims were not time-barred, found that Paxton had breached the lease and was in violation of the covenant of good faith, and awarded Quinlan attorney fees.  We affirm.

## I.  BACKGROUND

Circumstances require us to discuss in some detail the evidence presented at trial.[1] Since 1974, Paxton has lived in an apartment building located in San Francisco's Pacific

---

[1] Paxton requests that we take judicial notice of 10 items.  He acknowledges that nine of the items were not admitted into evidence at trial, but argues those items would allow this court "greater resources to make an accurate ruling in this appeal."  A " 'court will not normally take judicial notice of matters which were not brought to the attention

1

Heights neighborhood.  Built around 1906, the apartment building was completely renovated before Paxton moved in.  Paxton's apartment has three bedrooms, a western bathroom with a bathtub, and an eastern bathroom with a shower stall.  The eastern bathroom is 27 square feet in size, and in 1986 the shower had tile walls, a simple shower head with two knobs, a terrazzo shower pan, and a door made of nontempered glass.  The bathroom also had a small sink, toilet, and tile floor.

In about 1986, Paxton settled pending litigation with his then-landlord by negotiating favorable terms in a lease that was later recorded.  Pertinent here is a provision entitled "Landlord's Obligation to Repair and Maintain" (the repair provision): "*Landlord agrees to maintain the building*, roof, plumbing, electrical and heating system, Tenant's parking space, and grounds *in good quality*, and in a safe and sanitary condition.  Landlord agrees to provide interior paint for Tenant's unit, to clean garbage areas, stairs, and all other common areas at least once a week; Landlord shall also comply with all state and local laws, regulations and ordinances concerning the condition of dwelling units. [¶] *Landlord agrees to make repairs with reasonable quality materials and craftsmanship.  When items are replaced Landlord agrees to obtain Tenant's consent with regard to color, style, and quality*. [¶] For the purpose of this Lease, the definition of repairs under Civil Code Section 1941 shall be expanded to include water leaks. [¶] If Landlord fails to comply with his obligations under this paragraph, in addition to other remedies available under law, Tenant may make such repairs and deduct the cost thereof from the rent. [¶] Landlord agrees not to pass through to Tenant the costs of making repairs under this Section."  (Italics added.)

Most of the present controversy concerns the single sentence of the lease dealing with Paxton's "consent with regard to color, style, and quality" of items replaced during

---

of the trial court . . . .' " (*County of Orange v. Smith* (2005) 132 Cal.App.4th 1434, 1450.)  We deny the request to take judicial notice of the first nine items on this ground.  Paxton describes the 10th item as a set of exhibits that were admitted at trial but are missing from the record transmitted by the superior court.  Quinlan does not oppose Paxton's request.  We therefore augment the record with those exhibits.

repairs by his landlord (the consent clause). Also relevant is a provision entitled "Entry by Landlord," which allows the landlord to enter only to make necessary repairs, to exhibit the unit to prospective purchasers, mortgagees and tenants, or in cases of emergency. Except in emergencies, "[s]uch entries shall take place only with the consent of Tenant, which consent shall not be unreasonably withheld."

Paxton testified that his understanding at the time the lease was negotiated was that the consent clause gave him the right to select replacement items in his apartment, "within what the landlord explained to me was his understanding of the word 'good.'" "What I understood was what [the then-landlord] expressed as to limitations . . . . And that was that they would be maintained in . . . good condition. The quality of replacement materials would be good. And when asked to elaborate what 'good' meant to him, he said consistent with other buildings, what was accustomed to other buildings in the Pacific Heights neighborhood. He went on to say . . . that I certainly don't expect him . . . [to] put in gold-plated faucets."

When the building was sold to Quinlan's predecessor, Paxton's relationship with the new property manager was "hostile," and the manager did not complete repairs despite promising to do so. By the time Quinlan bought the building in 2005, the building had possible structural problems and Paxton's apartment had severe paint chipping and flaking in the living room; rotten and deteriorated window frames in the kitchen; old flooring in the kitchen; cracks, holes in the wall, peeling paint and mold in the eastern bedroom; cracked tile and a broken sash in the western bathroom; several problems in the eastern bathroom; chipping paint and extensive mold in the front room; and a malfunctioning heating system.

Quinlan had notice of Paxton's lease when he bought the building. Within a month or two of Quinlan's purchase, Paxton asked him to make some repairs. Quinlan believed tiles on the shower wall were becoming detached from the substrate.[2] Quinlan

---

[2] A photograph taken at the time shows white square tiles that are somewhat askew and interspersed with darkened grout and apparent mold at the edges of the shower floor.

testified that it would have cost about $500 to repair the shower when it was in that condition. Paxton also asked Quinlan to take care of peeling paint throughout his apartment and repair cracks in the lath and plaster walls. Quinlan agreed to make all requested repairs.

Before performing the work, Quinlan received a February 2006 letter from Paxton with detailed plans for remodeling the eastern bathroom. Paxton proposed replacing the shower with a new irregularly-shaped shower unit with a custom frame glass enclosure; moving and replumbing the sink; electrical rewiring; and adding a custom-built bench. Paxton specified two-toned tile work with accents, and a "Hansgrohe/Axor Phoenix Traditional shower; chrome finish (with thermostatic mixer, volume control and diverter)." In the cover letter, Paxton wrote, "I am not necessarily wedded to any of the specific materials (except for the shower fixtures); if you can get the same quality elsewhere at a cheaper price, I would be happy to work with you on that." Paxton testified that he proposed remodeling the eastern bathroom because he believed the shower pan's deteriorated condition required its replacement, and that replacement would necessitate enlargement of the shower to comply with current building codes. His plans were designed to accommodate a larger code-compliant shower in the eastern bathroom's small space. Quinlan testified he disagreed about the need to replace the shower pan and therefore disagreed that the shower needed to be enlarged to become code-compliant.

Communicating through the property manager, Quinlan rejected Paxton's 2006 proposal, saying he was not required to make such a "drastic upgrade." Quinlan and Paxton continued to discuss the issue between 2006 and 2009 (apparently indirectly through the property manager), but each party agreed only to his own proposed scope of work and no work was done to the eastern bathroom. However, other repairs were made in Paxton's apartment during this time period, including repairs to the heating ducts, certain windows, the dishwasher, and the garbage disposal. As to the last item, Paxton testified, "There were several choices on garbage disposals. I wanted to have one that was a slightly larger horsepower. There was some resistance from the [current] property

4

manager, and I said this one is the one I would like to have in our kitchen. I went ahead and purchased it, [deducting the cost from my rent,] and it got installed."

In 2008, Paxton purchased the Hansgrohe shower fixture he wanted for the eastern bathroom and deducted the $1,600 cost from his rent.[3] Paxton testified he was having trouble with water pressure and temperature fluctuations, and the Hansgrohe fixture was the cheapest fixture on the market with temperature and pressure controls as well as a diverter. However, Quinlan refused to install the Hansgrohe fixture in the eastern shower.

In October 2009, Paxton reported the condition of his apartment to the San Francisco Department of Building Inspection (DBI), which issued a notice of violation to Quinlan (2009 NOV). The 2009 NOV required Quinlan to make the following repairs within 30 days: "[p]rovide adequate water pressure [to the] shower room"; "[r]epair damaged ceilings [and walls in the] eastern living[ ]room, bathroom, bedroom and hall (2 locations)"; "[r]eplace missing/cracked tiles [in the] tub[ ]room"; "[r]epair/[r]eplace deteriorated shower floor and prevent water seepage from shower area"; "[e]liminate mold/mildew from wall and windows of eastern bedroom"; "[r]emove peeling paint [in the] ceiling (western bedroom)"; and "[c]lean heater vent system to ensure vents operating properly." Each ordered repair was supported by citation to provisions of the San Francisco Housing Code (see, e.g., S.F. Housing Code §§ 1001, 1301, 1306).

Quinlan testified that he was willing to make the repairs listed on the 2009 NOV, and he so informed the DBI. However, his property manager and Paxton were not able to come to an agreement on a scope of work. In December 2010, Paxton filed small claims actions against Quinlan, seeking $7,500 in "[l]iquidated damages, per contract, for harassment on January 1, 2010. Failure to correct NOVs, intolerable condition of shower; locking me out of storage; allowed conditions to persist preventing me from

_____

[3] Quinlan never took action to recover the withheld rent.

5

having access to my parking space and storage." Paxton lost both cases and judgment was entered for Quinlan.[4]

In 2012, Quinlan received a final warning from DBI stating that he would face substantial penalties if the violations were not abated. The property manager met with Paxton to discuss the repairs, but Quinlan directed her to refuse Paxton's requests for the Hansgrohe fixture, recessed lights, recessed soap niches, a nonstandard shower enclosure, or a new shower pan. Quinlan attempted to carry out the repairs, but Paxton refused access to the apartment. On March 8, 2012, Paxton sent the property manager an updated proposal, which was similar to, but more detailed than, his 2006 proposal. In a cover letter, he wrote, "You have told me that [Quinlan] object[s] to some of my specifications. [He has] no right to object, since the Lease provides me with the right to select styles, materials and colors. Nonetheless, I have told you that I will voluntarily increase my rent by $25 per month to placate [Quinlan] on this issue." Paxton requested compensation under San Francisco's rent ordinance for his relocation costs while the repairs were being done or, in the alternative, relocation to a hotel. He also requested escalating monetary penalties if the repairs took longer than 10 days (a rent waiver), 15 days ($100 per day) or 30 days ($10,000 lump sum). He wrote that repairs could commence on April 9 if Quinlan agreed to his demands. Paxton testified that his 2012 proposal was a general guideline of what he wanted. "I sat down with [the property manager] somewhere around this point in time, and we went through things. And I think if she and I would have been left alone, we would have hammered it out." He specifically would have been willing to negotiate on the financial terms of the proposal, but Quinlan never engaged in negotiation.

Referencing Paxton's March 8, 2012 letter, Quinlan proposed his own written scope of work. He proposed installing a "pressure balanced valve with adjustable volume

---

[4] Quinlan suggested at trial that the small claims judgments collaterally estopped Paxton from arguing Quinlan breached the lease by rejecting Paxton's 2012 proposal, but the trial court did not appear persuaded and made no collateral estoppel ruling in its statement of decision. Quinlan does not renew the argument on appeal.

6

and temperature" and attached a description of a specific fixture. He planned to test the shower pan for leaks and if necessary replace it with a new shower base using the tiles Paxton had approved for the walls and floor. He would also replace the glass shower enclosure if it leaked. He attached descriptions of the tile and shower enclosure. For repairs needed in the western bathroom, he enclosed a sample of tile that Paxton apparently had already approved. Quinlan also planned to remove peeling paint and repaint using lead abatement techniques, and to clean the heating vents. Quinlan agreed to an April 9, 2012 start date and arranged for Paxton to stay at a hotel of Paxton's choice while the repairs were being made, which was estimated to take four weeks.

Quinlan and Paxton continued to exchange correspondence. They did not come to agreement on the scope of repairs in 2012, and Paxton did not allow contractors to enter the apartment to carry out Quinlan's proposal. Neither party took legal action to force compliance with the lease or partial repairs to prevent further damage to the building. Quinlan testified: "[B]ecause the final warning was not being acted upon, because of my inability to get access of the apartment, the [DBI] referred the matter to [the] Abatement Appeals Board, which is their administrative body" and a hearing was scheduled. Paxton and Quinlan both attended the hearing. The board upheld the order of abatement but recommended mediation, which was unsuccessful. The DBI chief housing inspector, who met with Paxton and Quinlan in 2013, testified at trial that Quinlan seemed ready and willing to make the repairs necessary to clear the 2009 NOV.

In December 2013, Quinlan filed this action against Paxton. He pleaded claims for breach of contract and breach of the implied covenant of good faith and fair dealing, and sought declaratory relief clarifying the parties' rights and obligations under the lease, as well as preliminary and permanent injunctive relief allowing Quinlan to perform the work.

By 2014, the condition of Paxton's apartment had deteriorated. Many tiles had fallen off the shower wall in the eastern bathroom and the substrate had a large gaping hole; the shower pan was discolored and pitted; and, just outside the shower stall, the wall paint had buckled and a dark area of apparent water damage was by the baseboard.

7

Floor tile in the western bathroom was cracked, and several ceilings and walls had severely flaking paint.

In March 2014, Quinlan moved for a preliminary injunction to require Paxton to provide access to the apartment so the repairs listed in the 2009 NOV could be completed. On May 22, the court (Judge A. James Robertson II) ordered: "[Paxton] is enjoined from obstructing [Quinlan's] good faith efforts (these efforts have to be compliant with all the building codes and signed off by the DBI upon completion) to make . . . necessary repairs to [the apartment] as described in [Quinlan's 2012 proposal]. [¶] . . . [¶] . . . I[n] granting this preliminary injunction the Court concluded that the Court should read the provisions re 'tenant consent' as requiring tenant defendant to not unreasonably with[h]old approval of necessary repairs." The court ultimately ordered Paxton to "have the subject premises ready for [Quinlan] to commence repairs and free of human occupancy no later than 9:00 a.m. on July 14, 2014."

The repairs were made in 2014.[5] In the eastern bathroom, Quinlan installed a medium-quality shower fixture similar to what he previously proposed, which cost $150 and had water temperature and pressure controls to address Paxton's concerns.[6] He did not install the Hansgrohe fixture provided by Paxton because it had been discontinued by the manufacturer due to performance problems and was more difficult to install. He did not give Paxton a choice of fixtures. Quinlan ultimately had to remove the shower pan due to extensive water damage to the structural wood framing of the shower stall. Consequently, he enlarged the shower to comply with building codes. He inquired about a replacement terrazzo shower pan but was told it would take six weeks to obtain, so he installed a non-terrazzo shower pan that he deemed to be of similar quality and cost. He did not ask for Paxton's consent regarding the choice of shower pan. Quinlan also

---

[5] Paxton moved for appointment of a receiver to "oversee and facilitate" the repairs and ensure they were done "in conformity with [the] Lease." The court denied the motion.

[6] A building inspector testified that all current code-compliant shower fixtures provided water pressure and temperature controls.

installed a new shower enclosure without asking for Paxton's consent. Quinlan repainted areas of the apartment listed on the 2009 NOV using lead abatement techniques. He did not repaint the trim, baseboards or upper moldings unless they were specifically identified in the 2009 NOV because doing so would have been very labor intensive, adding probably another 100 person-hours of work at $65 an hour and approximately doubling the cost of the paint job. Quinlan used paint and tile colors Paxton had agreed to. He also paid Paxton's relocation costs during the construction work.

The 2014 repairs passed inspection and the 2009 NOV was cleared. The bathroom repairs alone cost Quinlan $20,000 to $25,000 in addition to the 110 hours of personal work he expended on the project, which he valued at $100 per hour. Photographs admitted in evidence showed the apartment walls, ceilings and bathrooms in what appeared to be good condition. Quinlan opined that the repairs were the same quality as was typical for the neighborhood.

Paxton testified that the shower fixture Quinlan installed did not have all of the features of the Hansgrohe fixture, and it only marginally improved the water pressure and temperature fluctuation problems. Moreover, following the 2014 repairs, Paxton had to approach the sink from his side due to a reduced clearance (18-inches) between the bathroom wall on one side of the sink to the shower wall on the other side. Some of the rooms had more than one color of paint, very few baseboards or trim had been painted, and large areas of paint had been pulled off when tape was removed to disassemble the lead paint mitigation. Finally, the tub in the western bathroom leaked. Paxton contacted Quinlan about additional work that was needed, but was rebuffed except with respect to repairing the tub. Paxton hired painters to correct the mismatching colors and to paint baseboards and trim, at a cost of approximately $1,300.

Judge James J. McBride presided over a three-day bench trial. Paxton moved for judgment on the pleadings at the outset and for judgment after the close of Quinlan's case (see Code Civ. Proc., § 631.8), both times on the ground that Quinlan's claims were time-barred. He argued the claims arose in 2005, or 2009 at the latest, and were barred under the four-year limitations period for contract actions (see Code Civ. Proc., § 337). The

9

court denied the motions but indicated the statute of limitations defense remained a live issue. Other issues included whether the 2014 repairs complied with the lease and a declaration on the meaning of the repair provision.[7]

During closing arguments, the court repeatedly asked both parties to explain what caused the multiple-year delay in completing repairs, and closely questioned Paxton as to what Paxton believed was the scope of his discretion under the consent clause. The court made a tentative oral ruling from the bench and later signed a statement of decision submitted by Quinlan's counsel.

In the statement of decision, the court ruled that the lease "requires reasonable behavior on . . . both sides and that is a term implied throughout the lease, and furthermore, the Court finds that the Lease requires that the tenant is to not unreasonably withhold his consent to necessary repairs. [¶] [Quinlan's] 2012 Work Proposal, . . . and the repairs that [Quinlan] made to the Premises in July 2014 consistent with that Work Proposal, complied with the terms of the Lease. [Quinlan] offered to make repairs with reasonable quality materials and craftsmanship when he provided [Paxton] with the Work Proposal. [He] agreed to remedy the condition of the bathroom and [Paxton] imposed unreasonable conditions in response, including monetary penalties and a quality of fixture with respect to plumbing fixtures which was not reasonably required under the terms of the Lease which requires [Quinlan] to obtain consent for color, style, and quality. The $1,600 Hansgrohe shower fixture was far in excess of what was reasonably required. Had [Paxton] engaged in any reasonable behavior there may have been some compromise but there was not. The Court finds that the evidence supports a finding that [Quinlan] behaved reasonably in response to the 2009 [NOV], that his proposals were reasonable under the Lease, and that [Paxton] unreasonably withheld his consent under the Lease

---

[7] Before trial, Paxton moved for leave to file a cross-complaint, arguing he was "concerned that [Quinlan] may attempt to dismiss the current action, depriving [Paxton] an adjudication on the merits and permanently leaving him with repairs that do not conform" with the lease. At an unreported hearing, the court (Judge Ronald E. Quidachay) denied the motion.

10

when he refused to give [Quinlan] access to the Premises to make the repairs and by placing unreasonable conditions on the repair work.

"Furthermore, the Court finds that the work that [Quinlan] performed in 2014 was adequate, compliant with his obligations under the terms of the Lease, and that [Quinlan] is not required to make any additional repairs to the Premises. [He] is not obligated to repaint areas of the trim that were not damaged or deteriorated and [the court finds] that the areas of wall painted which were badly deteriorated have been remedied. [Quinlan] is not obligated under the Lease to repaint the entire Premises, nor to use, install or consent to a quality of repair or replacement items that is anything higher or greater than 'reasonable' or 'good.' To the extent [Quinlan] was required to use paint of a quality and color consented to by [Paxton], [he] did so in a manner consistent with the Lease.

"Lastly, the Court finds that [Quinlan's] action was filed timely after it became obvious that [Paxton] was not going to consent to the Work Proposal offered by [Quinlan]." The court ruled that Paxton breached the lease and the implied covenant of good faith and fair dealing. No damages were awarded, as Quinlan neither sought nor proved them. Quinlan's request for permanent injunctive relief was denied "as moot in light of the work that was completed in July of 2014 and the declaratory relief as set forth herein." The court overruled Paxton's objections to the proposed statement of decision. The court later awarded Quinlan $126,411.50 in attorney fees and costs pursuant to the lease.[8]

## II.    DISCUSSION

" 'In general, in reviewing a judgment based upon a statement of decision following a bench trial, "any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision." ' " (*Lui v. City and County of San Francisco* (2012) 211 Cal.App.4th 962, 969.) " 'We may not reweigh the evidence and are bound by the trial court's credibility

---

[8] Paxton does not separately challenge the fee award on appeal.

determinations. [Citations.] Moreover, findings of fact are liberally construed to support the judgment.' " (*Ibid.*)

When the trial court has resolved a disputed factual issue, we review the court's findings for substantial evidence. (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632.) An issue presented on undisputed facts is an issue of law, which we review de novo. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799.) When an issue raised on appeal is a mixed question of law and fact, a three-step analysis is employed by the appellate court: (1) review the trial court's resolution of disputed historical facts under the deferential substantial evidence rule; (2) exercise independent judgment as to what law applies; and (3) review application of the law to the facts. (*Id.* at p. 800.) The third step is treated as a question of law when legal concepts and their underlying values must be considered or when the issue has practical significance beyond the confines of the case at hand, but the question is reviewed as a question of fact when the application of the law to the facts is founded on experience with human affairs. (*Id.* at pp. 800–801.)

A.    *Statute of Limitations Defense*

Paxton argues that Quinlan's cause of action for breach of contract accrued at the latest on October 9, 2009, which was more than four years before he filed suit.[9] Quinlan counters that the gravamen of his complaint was Paxton's refusal to consent to Quinlan's proposed scope of work, which occurred in 2012. The court found that the action was "filed timely after it became obvious that [Paxton] was not going to consent to [Quinlan's proposal]." We conclude the action was timely under the theory of continuous accrual.

The underlying timeline of events that is relevant to Paxton's statute of limitations defense is undisputed by the parties. "The application of the statute of limitations on undisputed facts is a purely legal question [citation]; accordingly, we review the lower

---

[9] On June 24, 2016, Paxton requested leave to file a supplemental brief because he had recently discovered a 1979 case relevant to the statute of limitations issue. Belated discovery of long-extant case law is not a reasonable justification for filing a supplemental brief. (See Cal. Rules of Court, rule 8.200(a)(4).) The request is denied.

12

court[']s rulings de novo. . . . [¶] . . . [¶] An affirmative defense, the statute of limitations exists to promote the diligent assertion of claims, ensure defendants the opportunity to collect evidence while still fresh, and provide repose and protection from dilatory suits once excess time has passed. [Citations.] . . . [¶] The limitations period . . . runs from the moment a claim accrues. [Citations.] Traditionally at common law, a 'cause of action accrues "when [it] is complete with all of its elements"—those elements being wrongdoing, harm, and causation.' [Citation.] This is the 'last element' accrual rule . . . .' [Citations.] [¶] To align the actual application of the limitations defense more closely with the policy goals animating it, [however,] the courts and the Legislature have over time developed a handful of equitable exceptions to and modifications of the usual rules governing limitations periods." (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1191–1192.)

As relevant here, "the theory of continuous accrual . . . is a response to the inequities that would arise if the expiration of the limitations period following a first breach of duty or instance of misconduct were treated as sufficient to bar suit for any subsequent breach or misconduct; parties engaged in long-standing misfeasance would thereby obtain immunity in perpetuity from suit even for recent and ongoing misfeasance. In addition, where misfeasance is ongoing, a defendant's claim to repose, the principal justification underlying the limitations defense, is vitiated. [¶] To address these concerns, we have long settled that separate, recurring invasions of the same right can each trigger their own statute of limitations. . . . [¶] Generally speaking, continuous accrual applies whenever there is a continuing or recurring obligation: 'When an obligation or liability arises on a recurring basis, a cause of action accrues each time a wrongful act occurs, triggering a new limitations period.' . . . [¶] However, . . . the theory of continuous accrual supports recovery only for damages arising from those breaches falling within the limitations period." (*Aryeh v. Canon Business Solutions, Inc., supra,* 55 Cal.4th at pp. 1198–1199.)

The continuous accrual exception applies here. The lease imposed continuing obligations on both parties—on Quinlan to keep the apartment in good repair (and to

obtain Paxton's consent regarding the color, style and quality of replacement items), and on Paxton to reasonably consent to entry into the apartment for the purpose of making repairs. To suggest Quinlan's refusal to make requested repairs in 2006 or Paxton's refusal to grant access in 2006 barred an action by either party based on the then-existing defects in the apartment, would lead to absurd results that are inconsistent with the purpose of the statute to protect a defendant's claim to repose. Paxton would be forever after unable to pursue any remedy for those defects, and Quinlan would be powerless to correct water damage originating from the apartment that could threaten the structural integrity of the entire building. In this case, both sides continued to demand action from the other party so that repairs would be performed. Repeated failures to repair or obtain consent and repeated denials of access are recurring invasions of rights under the lease. The consequence of Quinlan's delay in filing a lawsuit is a limitation on recoverable damages. Given that he did not seek damages in this action, that limitation is immaterial. The trial court did not err in rejecting Paxton's statute of limitations defense.

B. *Contract Interpretation*

Paxton argues the consent clause should be interpreted to grant him what he refers to as "broad" and "very unusual" discretion to give or withhold his consent to selection of replacement materials. While he does not assert a right to unfettered discretion, he contends he had a right to require materials consistent with other buildings in the neighborhood, even if that required higher quality materials than the items they replaced. Paxton also suggests, however, that his decision to grant or withhold consent was not subject to any requirement of reasonableness.

Although the court's statement of decision does not provide an explicit interpretation of the consent clause, Quinlan argues the trial court implicitly construed the clause to grant Paxton power to ensure the apartment would not be downgraded through replacement materials, with due consideration for the landlord's costs. We agree with Quinlan's view and conclude the court's interpretation was correct.

" 'When a dispute arises over the meaning of contract language, the first question to be decided is whether the language is "reasonably susceptible" to the interpretation

14

urged by the party. If it is not, the case is over. [Citation.] If the court decides the language is reasonably susceptible to the interpretation urged, the court moves to the second question: what did the parties intend the language to mean?' [Citations.] Whether the contract is reasonably susceptible to a party's interpretation can be determined from the language of the contract itself or from extrinsic evidence of the parties' intent. [Citation.] Extrinsic evidence can include the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties. [Citations.] When no extrinsic evidence is introduced or the extrinsic evidence was not relied on by the trial court or is not in conflict, we independently construe the contract." (*Cedars-Sinai Medical Center v. Shewry* (2006) 137 Cal.App.4th 964, 979–980.) When "ascertaining the intent of the parties at the time the contract was executed depends on the credibility of extrinsic evidence, that credibility determination and the interpretation of the contract [based on the extrinsic evidence] are questions of fact . . . ." (*City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 395.)

As a preliminary matter, we reject Paxton's argument that he was "hobbled in presenting [parol] evidence that the contract was reasonably susceptible to the interpretation urged by Paxton." At the start of trial, the trial court stated that it viewed the repair provision as unambiguous, but it did not impose any restrictions on Paxton's evidence. When Paxton said he intended to present extrinsic evidence on the meaning of the contract, the court said, "I will pay attention to what I pay attention to [during the trial], but the contract is the contract . . . ." In other words, the court indicated it *might* consider any offered parol evidence legally irrelevant, but it did not restrict presentation of Paxton's case. Paxton essentially concedes this fact by arguing "*discourage*[*d*] evidence as to the intent of the original contracting parties" (italics added) when it should have "remained silent . . . until it had heard Paxton's unfettered testimony." He does not contend any proffered evidence was improperly excluded. Paxton in fact testified at trial about the circumstances under which the lease was negotiated, and the court made

15

comments during closing argument suggesting Paxton's testimony influenced the court's understanding of the lease.

The only express interpretation of the lease in the statement of decision is the court's statement that the lease "requires reasonable behavior on . . . both sides" as to all of its provisions. We accept Quinlan's invitation to consider the trial court's comments during closing arguments as evidence of its interpretation of the consent clause: comments agreeing with Paxton's argument that the consent clause was intended to prevent the landlord from downgrading the apartment's overall quality and opining that reasonableness regarding the style and quality prongs of the consent clause must relate primarily to the associated costs to the landlord. We now consider whether that implicit interpretation was correct.

We begin with the plain language of the provision: "When items are replaced, Landlord agrees to obtain Tenant's consent with regard to color, style, and quality." This sentence is ambiguous regarding the extent of Paxton's discretion to withhold consent for replacement items because the term "consent" is neither defined nor expressly restricted. In the trial court, Quinlan argued the consent clause gave Paxton no power to insist on a level quality higher than the statutory standards of habitability for residential rental units. He noted that the repair provision references a habitability statute (Civ. Code, § 1941), and argued that "repair" in the provision means "anything that . . . takes the unit out of an untenantable condition. That's what the landlord is obligated to do . . . as a matter of this particular contract." We are not persuaded by this argument, which Quinlan does not pursue on appeal. The first paragraph of the repair provision requires the landlord to maintain the building and apartment in "good quality, and in a safe and sanitary condition," and to "*also* comply with all state and local laws, regulations and ordinances concerning the condition of dwelling units." (Italics added.) The expansive term "good quality" and the use of "also" suggests that the contractual standard of repair goes beyond the statutory standard. The next sentence in the provision reads, "Landlord agrees to make repairs with reasonable quality materials and craftsmanship," followed by the consent clause. Because the consent clause patently grants Paxton rights above and

16

beyond those conferred by the habitability statutes, this entire two-sentence paragraph can reasonably be read to impose a standard of quality above and beyond the statutory standard. When construed in its entirety, the plain language of the repair provision does not unambiguously limit the landlord's repair obligation to the statutory habitability standard; the contractual language is ambiguous. The trial court reached the same conclusion.

Because the plain language is ambiguous, we consider extrinsic evidence on the meaning of the repair provision and its consent clause. In the statement of decision, the trial court made a finding that the lease, "among other things, was part of the settlement of a lawsuit." During closing arguments, the court commented that Paxton's testimony about the 1986 lease negotiations was relevant evidence because "he moved into a recently upgraded building and his expectation was that any changes would not downgrade that. I agree with that."[10] We infer that the trial court found that the mutual intent of the parties who negotiated the lease in 1986 was that the landlord would have an obligation to make repairs in such a manner that the quality of the apartment was not downgraded. In light of that extrinsic evidence, we infer that the court construed ambiguities in the plain language of the repair provision in the manner previously discussed: Quinlan has an obligation to make repairs in a manner that does not downgrade the apartment's condition from its condition in 1986 and to obtain Paxton's consent to the color, style and quality of replacement items within reasonable cost limits. Because the court's factual findings on the extrinsic evidence is supported by substantial evidence (Paxton's testimony), we find this to be a reasonable interpretation of the repair provision.

Paxton argues that his rights under the consent clause are more expansive. He first argues that "[t]he original contracting parties had no intention to limit the qualitative standard to something similar to what was being replaced; that interpretation was the

---

[10] The court, however, observed that the condition of the apartment in 1986 indicated that it was "obviously intended as a rental," and specific areas like the shower room and kitchen might be characterized as "functional" or "nice," but "hardly high end."

Court's own proffered supposition, not supported by any evidence." We disagree. Paxton testified as to the consent clause: "I certainly assumed that *there is* [*a*] *limitation* within what the landlord explained to me was his understanding the word 'good.' That the building be kept in good condition . . . ." (Italics added.) The court reasonably inferred from this testimony that the applicable standard was the existing condition of the apartment. Paxton notes that he also testified the landlord told him the apartment's condition would be consistent with other units in the neighborhood, and he argues this evidence demonstrates the applicable standard was "consistent with other buildings in the Pacific Heights neighborhood," even if that standard was higher than the existing condition of the apartment. However, even if that was a possible inference from the evidence, we must defer to the trial court's finding that is supported by substantial evidence. Moreover, Paxton's proposed interpretation would not assist him in any event because substantial evidence in the record (Quinlan's testimony) supported the inference that the 2014 repairs were consistent with prevailing standards in the neighborhood.

Paxton next argues that "consent" in the consent clause, when construed in the context of the entire lease, should be interpreted to confer nearly unfettered discretion to him. He notes that "consent" in other lease provisions is expressly limited with the phrase "consent shall not be unreasonably withheld," but "consent" is not so limited in the consent clause. This argument might have force but for the extrinsic evidence (i.e., Paxton's testimony) that Paxton, an original contracting party, understood that his right to withhold consent under the consent clause *was* subject to a reasonableness limitation. Because the court found this was the original intent and the lease is amenable to that interpretation, the possible inconsistency in the plain language of various provisions of the lease does not compel a different interpretation.

Finally, Paxton argues that applying the implied covenant of good faith and fair dealing (i.e., the reasonableness requirement) to the consent clause improperly vitiates an express contract right that Paxton bargained for and obtained in the contract. The cases he cites, however, stand for the principle that the implied covenant will not alter an *unambiguous* and *specific* express contractual right of unfettered discretion, not that the

18

implied covenant is inapplicable to any contractual provision that involves the exercise of discretion. *Carma Developers* (*Cal.*)*, Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, for example, holds " 'that the parties may, by express provisions of the contract, grant the right to engage in the very acts and conduct which would otherwise have been forbidden by an implied covenant of good faith and fair dealing.' " (*Id.* at p. 374.) In *Carma*, a commercial lease prohibited subletting of the premises without the landlord's prior written consent, " 'which consent shall not be unreasonably withheld' "; however, the lease also expressly allowed the landlord to terminate the existing lease and enter into a new lease with the intended sublessee and thereby capture any rent increase. (*Id.* at pp. 351–352.) The court rejected an argument that the implied covenant of good faith and fair dealing barred the landlord from exercising that right unless it had a reasonable objection to the proposed sublessee. (*Id.* at pp. 373–374.) Similarly, in *Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, a contract gave the Disney corporation the right to license use of film characters for promotion or advertising "as [Disney] may see fit," and also provided that Disney "shall not be under any obligation to exercise any of the rights granted" under the contract. (*Id.* at p. 1121 & fn. 7; see *id.* at pp. 1112–1113.) The court held the implied covenant did not apply to Disney's licensing decisions. (*Id.* at pp. 1121–1123.) In contrast, a federal district court held that a provision that simply granted a clothing company discretion to approve or disapprove retailers was subject to the implied covenant. (*Gabana Gulf Distribution, Ltd. v. GAP International Sales, Inc.* (N.D.Cal., Jan. 9, 2008, No. C-06-02584 CRB) 2008 U.S.Dist. Lexis 1658; see *Locke v. Warner Bros., Inc.* (1997) 57 Cal.App.4th 354, 358, 364–367 [provision granting movie studio nonexclusive first look at movie proposals and "pay or play" directing deal subject to implied covenant].) The consent clause here grants Paxton the power of consent to replacement materials, but does not expressly grant him unfettered discretion to withhold his consent nor does it specifically grant him the power to withhold his consent to particular items. The general right of consent conferred by the clause is therefore subject to the implied covenant of good faith.

19

In sum, we affirm the trial court's implied interpretation of the consent clause: Paxton had the right to withhold his consent to replacement items that would have downgraded the condition of the apartment, subject to reasonable restraints on the costs to the landlord.

C.  *Breach of Contract*

The trial court's judgment granted Quinlan declaratory relief that the work performed pursuant to the preliminary injunction "fully conforms with the lease terms requiring repairs." The court found that Paxton breached the lease "by unreasonably withholding his consent to the repairs proposed by [Quinlan]," and that Paxton breached the covenant of good faith "by refusing to grant [Quinlan] access to the premises to make necessary repairs and by imposing unreasonable conditions on [Quinlan's] ability to do so." Paxton argues that denial of access to the apartment was not a breach because Quinlan failed to perform conditions precedent under the lease. Paxton also contends that the court erred in finding Quinlan complied with the injunction: he specifically argues that "Quinlan's work did not comply with the terms of the Lease."[11] We construe these arguments as contentions that the trial court erred in finding Paxton breached the lease and Quinlan did not.[12] Quinlan argues the court's findings were "proper," i.e., supported by substantial evidence. We agree.

We first reject Paxton's specific argument that Quinlan's failure to perform conditions precedent excused any breach on Paxton's part. Paxton argues that he did not breach the access provision because Quinlan never fulfilled the condition precedent of obtaining his consent to Quinlan's proposed repairs. Paxton relies on Civil Code

---

[11] Paxton also argues the court erred in granting the preliminary injunction. Quinlan correctly notes that Paxton's appeal is untimely with respect to the preliminary injunction. (Code Civ. Proc., § 904.1, subd. (a)(6); Cal. Rules of Court, rule 8.104(a)(1).) The clarified preliminary injunction order was filed June 24, 2014, and the notice of appeal was filed more than 180 days later on April 23, 2015.

[12] We note that, in its oral tentative decision, the trial court found that "neither party acted reasonably with respect to their rights under the lease [between 2005 and 2012]." That finding is amply supported by the trial record, but it is not relevant to the ultimate issues here.

20

section 1439, labeled "Performance, etc., of conditions, *when essential*," which provides that "[b]efore any party to an obligation can require another party to perform any act under it, he must fulfill all *conditions precedent* thereto imposed upon himself . . . ." (Italics added.) However, "no obligation of a contract is to be regarded as a condition precedent unless made so by express terms or necessary implication." (*Verdier v. Verdier* (1955) 133 Cal.App.2d 325, 334 [requirement in marital separation agreement that wife not molest husband was not a condition precedent to husband's obligation to support her].) Paxton cites cases where the defendant's contractual obligation was expressly conditioned on the plaintiff's performance of a specific act (*Wiz Technology, Inc. v. Coopers & Lybrand* (2003) 106 Cal.App.4th 1, 5–7, 11–12 [accounting firm agreed to perform audit on condition that company hire new securities counsel; continued use of prior counsel excused accounting firm from conducting audit]), or where the condition precedent could be implied from the contract as a whole (*Consolidated World Investments, Inc. v. Lido Preferred Ltd.* (1992) 9 Cal.App.4th 373, 380 [when plaintiff failed to close escrow within 60 days as required by contract, the defendant's performance under the contract was excused]).

Here, Paxton's obligation to reasonably provide *access* was not expressly conditioned on Quinlan's compliance with the consent clause, and the latter was not a specific one-time act that was a necessary precondition to Paxton's performance. Rather, Quinlan's obligation to repair and obtain Paxton's consent to replacement items and Paxton's obligation to allow access to perform repairs were both ongoing obligations that required good faith on both sides. Enforcement of these provisions, therefore, is not amenable to condition precedent analysis.[13]

---

[13] Paxton also argues Quinlan was required to comply with San Francisco's rent control ordinance before Paxton could be required to vacate the premises for repairs. He ignores the fact that he was required to vacate by court order. Paxton also contends he was denied compensation required by the ordinance and the city's enforcement rules and regulations. He sought no such relief at trial. In a September 16, 2014 pretrial motion, Paxton sought $19,291 in such relocation expenses, which was denied on October 16,

21

Moreover, the evidence supports a finding that Quinlan sought Paxton's consent, but that Paxton unreasonably refused to provide it.  Substantial evidence supports the trial court's finding that Paxton breached the access provision by imposing unreasonable conditions on the repair work—"including monetary penalties and a quality of fixture . . . which was not reasonably required"—at least as of 2014, and by unreasonably withholding his consent to allow Quinlan to make repairs necessary to abate the 2009 NOV.

Substantial evidence further supports the finding that the 2014 repairs were "compliant with [Quinlan's] obligations under the terms of the Lease."  As we have discussed, the court could reasonably infer, from Paxton's own testimony, that Quinlan's obligation was to keep the building "in good condition . . . ," equivalent to the condition of the apartment in 1986 or earlier.  Even applying Paxton's putative standard of neighborhood equivalence, Quinlan's testimony by itself would supported an inference that the 2014 repairs were consistent with the prevailing standards in the neighborhood.  The court reasonably found that Quinlan had offered, in his 2012 proposed scope of work, "to make repairs with reasonable quality materials and craftsmanship," and the repairs Quinlan made to the apartment "complied with the terms of the Lease" as the court had interpreted it.

### III.    DISPOSITION

The judgment is affirmed.  Paxton shall bear Quinlan's costs on appeal.

---

2014 (Hon. Ronald E. Quidachay).  That order was not appealed, and the issue is not before us.

22

                                _____

                                BRUINIERS, J.

WE CONCUR:

_____

JONES, P. J.

_____

SIMONS, J.